ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| **EFRAÍN GONZÁLEZ DROZ YESSENNIA CANDELARIA y la Sociedad Legal de Gananciales**<br><br>Apelantes<br><br>v.<br><br>**ORGANIC MED GROWERS, INC.**<br><br>Apelados | KLAN202400172 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **Ponce**<br><br>Civil Núm.: **PO2020CV00726**<br><br>Sobre: Entredicho Provisional e Injunction, Daños y Perjuicios |
| **EFRAÍN GONZÁLEZ DROZ YESSENNIA CANDELARIA y la Sociedad Legal de Gananciales**<br><br>Demandantes<br><br>v.<br><br>**ORGANIC MED GROWERS, INC**.<br><br>Demandados | | Civil Núm.: **PO2020CV01974**<br><br>Sobre: Entredicho Provisional e Injunction, Daños y Perjuicios |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparecen ante nos el señor Efraín González Droz, la señora Yessenia Candelaria y la Sociedad Legal de Gananciales (matrimonio González-Candelaria o parte apelante) en solicitud de que revoquemos una *Sentencia Parcial* emitida el 19 de octubre de 2023 por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI).[1] En virtud del referido dictamen, el TPI declaró Ha Lugar una *Moción*

---

[1] Apéndice de *Apelación Civil*, Anejo 1, págs. 1-45. Archivada y notificada el 30 de octubre de 2023.

*de desestimación conforme a la Regla 39.2(c) de Procedimiento Civil* presentada por OMG Puerto Rico, LLC (OMG) como sucesora en interés de Organic Med Growers, Inc. (Organic Med), por lo que se desestimó la *Demanda* que incoó el matrimonio González-Candelaria contra OMG, Organic Med y el señor Elmer Román en calidad de Secretario de Estado de Puerto Rico (en conjunto, parte apelada).

Por los fundamentos que esbozaremos a continuación, se adelanta la confirmación del dictamen apelado.

Veamos el trasfondo fáctico y procesal atinente a este recurso.

**I.**

El caso de marras se originó el 29 de mayo de 2020 cuando el matrimonio González-Candelaria presentó una *Demanda* en el caso civil PO2020CV00726 sobre *injunction* preliminar y permanente contra Organic Med y el señor Elmer Román como Secretario de Estado.[2] En esencia, el matrimonio González-Candelaria arguyó ser accionista mayoritario de OMG, por poseer el cincuenta y un por ciento (51%) de las acciones. Además, enfatizó que el 9 de enero de 2019, en el Registro de Corporaciones del Departamento de Estado (Registro de Corporaciones) se presentó una Resolución Corporativa del 3 de enero de 2019, en la que el señor González Droz figuró como Presidente y Tesorero de OMG, mientras el señor Ronald Castillo como Vicepresidente y Secretario de la referida corporación. Manifestó que el 10 de enero de 2019, al Registro de Corporaciones se presentó una Resolución Corporativa del 15 de mayo de 2018, en la que se hizo constar que el señor Juan Álvarez renunció a OMG. No obstante a ello, alegó que el 30 de abril de 2020, al Registro de Corporaciones se presentó una Resolución Corporativa de igual fecha, suscrita por el señor Juan Álvarez, con un sello corporativo distinto al de OMG que obra en el Departamento de Estado. Esgrimió

---

[2] *Íd.*, Anejo 9, págs. 142-163.

que en la Resolución Corporativa del 30 de abril de 2020 se nombró una junta de directores para OMG sin que la parte apelante fuese convocada a alguna reunión de accionistas, a tenor con la Sección 7.12 de la Ley General de Corporaciones, 14 LPRA sec. 3652, participara en votación alguna, o estuviese conforme con la elección. Por ello, planteó que la nueva junta de directores de OMG estaba actuando *ultra vires* por no haber sido elegida conforme a derecho, por lo que entendió sus actos eran nulos *ab initio.* En síntesis, el matrimonio González-Candelaria alegó que ilegalmente, se removió a un director de la corporación mediante un consentimiento escrito no unánime para dejar vacantes todas las posiciones de directores y llenarlas con el mismo consentimiento escrito no unánime para no cumplir con las disposiciones estatutarias que requieren una reunión anual de accionistas. Igualmente, expuso que las acciones de la nueva junta de directores le causaron grandes daños, ya que estaban poniendo en peligro las licencias expedidas por el Departamento de Salud y el inventario de OMG. Subrayó que el 4 de mayo de 2020, al señor González Droz se les negó el acceso a las facilidades de OMG por instrucciones de la corporación, impidiéndole realizar su labor como Presidente y Supervisor de Producción y Manufactura, causándole daños morales.

Por otro lado, el matrimonio González-Candelaria acentuó que el Secretario de Estado faltó a su deber al enmendar el certificado de incorporación por tres (3) ocasiones, basado en la Resolución Corporativa del 30 de abril de 2020, en contravención con el Artículo 8.02 (B)(1) de la Ley General de Corporaciones, *supra,* sec. 3682. Asimismo, adujo que faltó al deber al permitir cambiar la oficina designada de la corporación cuando dicha enmienda no constaba en la Resolución Corporativa del 30 de abril de 2020. Señaló que la naturaleza de los actos de la nueva junta de directores y del Departamento de Estado causaría daños irreparables. Así que,

solicitó que el TPI emitiera un *injunction* preliminar y permanente sin prestación de fianza para que no se les obstaculice el acceso a las facilidades de OMG, que se determine que la nueva junta de directores no fue elegida conforme a derecho, que se emitiera una orden para restablecer la junta de directores anterior y una orden al Secretario de Estado para eliminar las enmiendas a los artículos de incorporación.

Posteriormente, el 20 de noviembre de 2020, el señor González Droz presentó una *Demanda* en el caso civil PO2022CV01979 sobre entredicho provisional e *injunction*, daños y perjuicios contra OMG. En esta, sostuvo que OMG, por conducto de sus administradores, en violación a su deber de fiducia de estos para con Organic Med y en daño directo para con el señor González Droz, no pagó el alquiler del edificio propiedad de la Autoridad de Puertos para que desahuciaran a Organic Med y se financiaran unas facilidades a nombre de OMG; causó la cancelación de la licencia de siembra de cannabis CM-2019-168 y la licencia de manufactura CM-2019-167, imposibilitando la continuidad del negocio; causó la destrucción de las siembras propiedad de Organic Med estimadas en $1,000,000.00; dejó de pagar los laboratorios que mantenían la calidad de los productos de Organic Med, acumulando una deuda de más de $50,000.00, y dejó de pagar a los suplidores, adeudando $250,000.00. Por otro lado, esbozó que los directores y accionistas de OMG proveyeron información falsa al Departamento de Estado para fusionar la corporación. El señor González Droz estimó que las acciones de OMG por conducto de sus administradores le causó unos daños en no menos de $4,000,000.00 y daños emocionales y angustias mentales en no menos de $1,000,000.00. Además, planteó que la industria del cannabis medicinal es altamente regulada, por lo que las acciones de OMG podían afectar la salud de los pacientes, puesto que no contaban con los conocimientos técnicos necesarios para cultivar y

procesar un producto de calidad. Por lo anterior, peticionó que el TPI ordenara el cese y desista de las acciones de OMG.

El 22 de febrero de 2021, OMG presentó una *Contestación a la Demanda, Defensas Afirmativas y Reconvención* en el caso civil PO2022CV01979.[3] Entre otras cosas, negó que la parte apelante sea el accionista mayoritario de OMG, ya que el 30 de abril de 2020 se aprobó una Resolución Corporativa para dejar vacante todas las posiciones en la junta de directores y elegir una nueva que aprobó fusionar Organic Med con OMG, sobreviviendo OMG. Alegó que Organic Med era el titular de las licencias CM-2019-167 y CM-2019-168, emitidas por la Junta Reglamentadora de Cannabis Medicinal, para el cultivo y la manufactura del cannabis medicinal. Sin embargo, sostuvo que tras la fusión, se solicitó la reestructuración, el cambio de dueño y la renovación de las referidas licencias, pero que el señor González Droz intervino, provocando una investigación que atrasó el proceso. Por ello, arguyó que el vencimiento de las referidas licencias fue atribuible al señor González Droz.

En la contestación a la *Demanda*, OMG presentó una reconvención. Mediante esta, alegó que en el año 2016 pactó con el señor González Droz una relación de negocios para el desarrollo de una facilidad de cannabis medicinal en Puerto Rico. Además, dispuso que el 19 de agosto de 2016 se convino un Acuerdo de Accionistas en el que se estipuló que el matrimonio González-Candelaria ostentaría un veinticuatro por ciento (24%) de participación en OMG y se acordó verbalmente que el señor González Droz fungiría como Administrador de la corporación, supervisando y manejando los negocios de Organic Med. Acentuó que, como parte de los acuerdos, el señor González Droz ha estado a cargo de todos los aspectos operacionales de OMG, pero que hacía representaciones de ser Presidente de la junta de

---

[3] *Íd.*, Anejo 11, págs. 176-284.

directores, sin ostentar dicho cargo. A su vez, aseveró que mientras el señor González Droz fungía como Administrador y Presidente de OMG, no mantuvo récords apropiados sobre los gastos corporativos, incurrió en negligencia crasa en el manejo de la empresa, más utilizó fondos y propiedad corporativa para uso personal. Igualmente, afirmó que durante las inspecciones realizadas los días 10 y 12 de marzo de 2020 por la Oficina de Cannabis Medicinal, OMG resultó ser multada administrativamente por $70,000.00, como resultado de las acciones y omisiones negligentes del señor González Droz. Por ello, destacó que el 30 de abril de 2020, los accionistas mayoritarios de OMG aprobaron una Resolución Corporativa para dejar vacante la junta de directores y enmendar el Certificado de Incorporación para actualizar los oficiales de la entidad y el 12 de junio de 2020, se aprobó la fusión de Organic Med con OMG. OMG solicitó que se declarara No Ha Lugar la *Demanda* instada por el señor González Droz y Con Lugar la *Reconvención* y, en su consecuencia, condenara a este al resarcimiento de daños y perjuicios por incumplimiento contractual en una cantidad no menor de $1,201,000.00; daños y perjuicios sufridos por OMG en una suma no menor de $2,123,000.00; ingresos dejados de percibir como resultado de su interferencia culposa y negligente con el proceso de renovación de licencias en una suma de $5,882,450.00 y temeridad y honorarios de abogados por la suma de $25,000.00.

A solicitud del matrimonio González-Candelaria, el 25 de marzo de 2021, el TPI dictó una *Orden de Consolidación* en la que concedió la consolidación de los casos PO2020CV00726 y PO2022CV01979.[4]

Posteriormente, el 15 de diciembre de 2021, la parte apelante presentó una *Moción de sentencia sumaria parcial.*[5] En síntesis, arguyó que los asuntos litigiosos en este caso versaban sobre

---

[4] *Íd.*, Anejo 16, págs. 298-299. Archivada y notificada el 25 de marzo de 2021.
[5] *Íd.*, Anejo 17, págs. 300-317.

cuestiones de derecho que el TPI podía resolver sin necesidad de un juicio plenario. A saber, el matrimonio González-Candelaria planteó que estaba en controversia si, a tenor con la Ley General de Corporaciones, *supra*, se le debía notificar para hacer una votación unánime de los accionistas a los fines de destituir al señor González Droz como Presidente de OMG y remover a la parte apelante como accionista.

En oposición, el 18 de enero de 2022, OMG estableció que la solicitud de sentencia sumaria del matrimonio González-Candelaria era improcedente, ya que existía controversia sobre los hechos materiales propuestos.[6] Esto, debido a que entendió que existía controversia sobre el hecho de que la parte apelante era el accionista mayoritario de Organic Med. Además, OMG dispuso que estaba en controversia la alegación del matrimonio González-Candelaria de violación al deber de fiducia, dado que concebía que, por el contrario, el señor González Droz incurrió en incumplimiento contractual y los daños reclamados eran atribuibles a este por estar en contravención a los mejores intereses y la sana administración del negocio. OMG señaló que, mediante la solicitud de sentencia sumaria, la parte apelante pretendió enmendar las alegaciones de la *Demanda*, sin solicitar permiso. A su vez, apuntó que la acción de los accionistas mayoritarios de OMG se basó en el Artículo 7.01 de la Ley General de Corporaciones, *supra*, sec. 3641 y el Artículo 7.17 del referido estatuto, *supra*, sec. 3657, a tenor con el mecanismo de consentimiento de los accionistas. Según la interpretación de OMG, el Artículo 7.17 de la Ley General de Corporaciones, *supra*, 3657, permitía celebrar reuniones sin convocatoria, votación y sin consentimiento unánime por escrito. Ante ello, indicó que los accionistas mayoritarios, con el mínimo necesario de votos, tomaron

---

[6] *Íd.*, Anejo 18, págs. 318-428.

una serie de determinaciones sin celebrar una reunión, que al día siguiente le notificaron las determinaciones al matrimonio González-Candelaria. OMG expresó que el Artículo 7.01 (C) de la Ley General de Corporaciones, *supra*, sec. 3641, permitía que cuando todas las posiciones directivas estuvieran vacantes, se eligieran a los directivos sin votación unánime y sin celebrar reunión. Por todo lo anterior, solicitó que se dictara sentencia sumaria a su favor.

El 7 de marzo de 2022, el TPI emitió y notificó una *Resolución* en la que declaró No Ha Lugar a las solicitudes del matrimonio González-Candelaria y de OMG en dictar sentencia sumaria a su favor y ordenó la continuación de los procedimientos.[7] No obstante, el Foro Primario resolvió que los siguientes hechos estaban incontrovertidos:

1. El 9 de agosto de 2016 se registró en el Departamento de Estado la corporación, Organic Med Growers, Inc., con el número de registro 380737.

2. El documento titulado ***Written Consent in Lieu of Meeting of the Stockholders*** (en adelante *Written Consent*) tiene fecha del 30 de abril de 2020. En el mismo, se hace constar que está suscrito por "*the shareholders owning a majority of the outstanding shares entitled to vote [...] acting by written or electronic communication consent in lieu of a majority thereof in accordance with the provisions of Article 7.17 of the Puerto Rico General Corporation Law of 2009*" y contiene varias firmas que se identifican como las de: Juan E. Álvarez, Ronald Steven Castillo, Martin Avilés, Jeffrey Swetnam, Frederick Ray Pitre, Roy Chu, George Stadler, William Zeichner y Félix Rosa.

3. En el *Written Consent* se consignó lo siguiente:
**BOARD OF DIRECTORS OF THE CORPORATION**
**WHEREAS**, the Shareholders of the Corporation have become aware that Efrain González have been representing himself as a member of the Board of Directors of the Corporation without ever being duly elected by the shareholders of the Corporation, as required by the Act;
**WHEREAS**, the Shareholders desire to remove all members of the Board of Directors, if any, and declare all seats of the Board of Directors vacant, including that purportedly held by Efrain González; and
**WHEREAS**, the Shareholders of the Corporation desire to elect all the members of the Board of Directors of the Corporation pursuant to Article 7.01(C) of the Act.

---

[7] *Íd.*, Anejo 19, págs. 429-450.

**NOW, THEREFORE, BE IT RESOLVED,** that the Shareholders hereby remove all members of the Board of Directors and declare all seats of the Board of Directors vacant.

**BE IT FURTHER RESOLVED,** that the Shareholders hereby elect the following persons as Directors of the Corporation until the next annual meeting of the shareholders of the Corporation:

1. George Stadler o Chairman of the Board of Directors
2. Martín Avilés o Director
3. Jeffrey Swetnam o Director
4. Fredrick Ray Pitre o Director
5. Ronald Steven Castillo o Director
6. Juan Álvarez o Director
7. Roy Chu o Director

**OFFICERS OF THE CORPORATION**

**WHEREAS**, the Shareholders desire remove Efrain González and Yessennia Candelaria from any officer position purportedly held in the Corporation and Gerardo González as the legal representative of the Corporation; and

**WHEREAS**, the Shareholders of the Corporation desire to appoint the officers and legal representatives of the Corporation.

**NOW THEREFORE, BE IT RESOLVED,** that Efrain González and Yessennia Candelaria are hereby removed from any officer position purportedly held in the Corporation and Gerardo González as the legal representative of the Corporation.

**BE IT FURTHER RESOLVED,** that the Shareholders hereby appoint the following persons to the office(s) indicated next to their name:

| | |
|---|---|
| George Stadler | President |
| Martín Avilés | Vice President |
| Jeffrey Swetnam | Vice President |
| Juan Álvarez | Secretary and Treasurer |
| Ronald Steven Castillo | Director of Finance |

**BE IT FURTHER RESOLVED,** that the Shareholders hereby appoint McConnel Valdés LLC as the legal representative of the Corporation.

**RECORDS OF THE CORPORATION**

**BE IT RESOLVED,** that the Shareholders hereby instruct Efrain González, Yessennia Candelaria, Gerardo González, and/or any other custodian of the records of the Corporation to deliver to Juan Alvarez, Secretary/Treasurer of the Corporation any and all records of the stock ledger, financial statement, bank account(s) information and statements, payroll records, applications and documents relating to the Medical Cannabis business submitted to the Puerto Rico Department of Health, any documents filed with any government authority and any license or permit issued by any governmental authority.

**AMENDMENTS TO THE CERTIFICATE OF INCORPORATION**

**WHEREAS**, the Shareholders of the Corporation desire to amend the Certificate of Incorporation of the Corporation proposed by the Board of Directors to (i) replace the listed Resident Agent of the Corporation, who is now deceased, with CT Corporation System and (ii)

change the nature and purpose of the business of the Corporation.

**NOW THEREFORE, BE IT RESOLVED**, that the Shareholders hereby approve the following amendments to the Certificate of Incorporation of the Corporation proposed by the Board of Directors:

Amendment to Article II of the Certificate of the Incorporation of the Corporation to replace the Resident Agent of the Corporation with the following person:

Name: C T Corporation System

Street Address: 361 San Francisco St. 4th Floor San Juan, PR 00901

Mailing Address: 361 San Francisco St. 4th Floor San Juan, PR 00901

E-mail Address: cls-ctinternational@wolterskluwer.com

Telephone: (787) 725-1004

Amendment to Article III of the Certificate of Incorporation of the Corporation to change the nature and purpose of the business of the Corporation as follows: The nature and purpose of the business is to engage in any and all lawful act or activity for which corporations may be organized under the Puerto Rico General Corporation Law of 2009, as amended.

**GENERAL PROVISIONS**

**BE IT RESOLVED**, that this consent may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall be considered one and the same instrument; and that this consent may be executed by facsimile or PDF.

**BE IT FURTHER RESOLVED**, that this consent be filed with the records of meetings of the shareholders.

4. Los demandantes Efraín González y Yessennia Candelaria no fueron convocados, ni notificados previamente de la reunión del 30 de abril de 2020.

5. El 21 de diciembre de 2018 fue cancelado el certificado de incorporación de Organic Med Growers, Inc.

6. El 9 de enero de 2019, el codemandante Efraín González presentó ante el Registro de Corporaciones del Departamento de Estado de Puerto Rico una Enmienda a los Artículos de Incorporación, a los fines de incluir como oficiales al Dr. González como Presidente y Tesorero y al Sr. Ronald Castillo como Vicepresidente y Secretario, se hace referencia a que se adjunta una Resolución Corporativa.

7. En esa misma fecha, 9 de enero de 2019, el certificado de incorporación de OMG fue restaurado.

8. El 30 de abril de 2020 se presentaron ante el Registro de Corporaciones del Departamento de Estado de Puerto Rico, enmiendas a los artículos de Incorporación de OMG, los cuales fueron registrados por el Departamento de Estado.

9. El 30 de abril de 2020, Juan Álvarez, como Secretario de la Corporación, suscribió una Resolución Corporativa

que contiene un sello corporativo distinto al sello corporativo que incluye la Resolución Corporativa que tiene fecha del 5 [de] mayo de 2018.

10. Los accionistas iniciales de Organic Med eran Juan E. [Á]lvarez, Efraín Gonz[á]lez, Yessennia Candelaria, Martín Avilés, PDP Health MGMT y Ronald Steven Castillo.

11. Inicialmente, los accionistas originales acordaron verbalmente que González, debido a su experiencia y conocimiento en la industria de Salud en Puerto Rico, fungiría como administrador de la corporación, supervisando y manejando los negocios de Organic Med.

12. En o alrededor del 10 de noviembre de 2016, Organic Med presentó una solicitud de licencia para establecimiento de cultivo de cannabis medicinal y una solicitud de licencia para establecimiento de manufactura de cannabis medicinal ante la Oficina de Cannabis Medicinal del Departamento de Salud de Puerto Rico.

13. El Sr. Ronald Castillo afirma que no presentó ante el Departamento de Estado la Resolución Corporativa del 15 de mayo de 2018 y que la firma que aparece en dicho documento no fue plasmada por él y que no fue convocado a una reunión de accionistas para elegir o designar a Efraín Gonz[á]lez Droz como miembro de determinado cargo en la Junta de Directores.

14. El 9 de septiembre de 2019, Organic Med se convirtió en titular de las licencias números CM-2019-167 y CM-2019-168 emitidas por la JRCM las cuales autorizaban la manufactura y el cultivo de cannabis medicinal en el establecimiento localizado en la Carr. 123 Km. 0.6 Calle Salmón Lote #5 Barrio Playa, en Ponce, Puerto Rico.

15. Las determinaciones tomadas el 30 de abril de 2020 se presentaron ante el Registro de Corporaciones y Entidades del Departamento de Estado.

16. El 10 de agosto de 2020, Organic Med presentó solicitud de renovación de las licencias.

17. El 10 de noviembre de 2020, la JRCM, por conducto de su Directora Ejecutiva, la Lcda. Denise Maldonado Rosa, informó que las licencias de Organic Med habían expirado.

No obstante, el TPI delimitó que los hechos que permanecían en controversia eran los siguientes:

1. Porciento de acciones que poseen los demandantes en la Corporación OMG, si alguno, al 30 de abril de 2020.

2. Porciento de acciones que poseen las personas que suscribieron el *Written Consent* del 30 de abril de 2020, si alguno.

3. Las circunstancias de la reunión del 30 de abril de 2020 y elección por el consentimiento de los accionistas; al declarar vacantes las posiciones en la misma fecha, justo antes de que se eligiera a los nuevos directores para componer la Junta, en la misma reunión, y si el ordenamiento corporativo permite tal acción.

4. Resuelto lo anterior, si procede o no el interdicto estatutario solicitado.

5. Las alegaciones por negligencia imputadas en la Demanda, valor de los daños si algunos y su relación causal.

6. Las alegaciones por negligencia e incumplimiento contractual imputadas a los demandantes en la Reconvención, valor de los daños si algunos y su relación causal.

Así las cosas, durante ocho (8) días entre el 24 de marzo de 2022 y el 16 de mayo de 2022, se celebraron unas vistas evidenciarias a los fines de dilucidar las controversias que incidían sobre la continuación de los procedimientos. La parte apelante presentó el testimonio del señor González Droz, el perito calígrafo Evaristo Álvarez Ghigliotti y del señor José Román Flores. Por su parte, OMG presentó el testimonio del señor Juan Álvarez, el señor George Stadler y el señor Ronald Steven Castillo.

Culminado el desfile de prueba, el 23 de junio de 2022, OMG presentó una *Moción de desestimación conforme a la Regla 39.2(c) de Procedimiento Civil*.[8] En esta, concretó que la carga probatoria recaía sobre la parte apelante, quien no descargaron su obligación de presentar prueba necesaria y suficiente para establecer los requisitos que se exige para la emisión de un interdicto. Planteó que luego del desfile de prueba documental y testifical, el matrimonio González-Candelaria no probó los elementos requeridos para que proceda el remedio interdictal solicitado, sea a tenor con la Ley General de Corporaciones, *supra*, o las Reglas de Procedimiento Civil, *supra*. Por dicha razón, OMG le peticionó al TPI que desestimara la *Demanda* presentada por la parte apelante, de conformidad con las

---

[8] *Íd.*, Anejo 7, págs. 111-128.

disposiciones de la Regla 39.2(c) de Procedimiento Civil, *supra*, R. 39.2(c), sobre insuficiencia de la prueba. OMG esgrimió que la parte apelada no probó que era accionista, accionista mayoritario de Organic Med ni las posiciones que ostentaban, más que no desfiló prueba sobre la ilegalidad de declarar vacante todas las posiciones de la junta de directores y elegir una nueva mediante el mecanismo de consentimiento escrito de accionistas. Por otro lado, expuso que el matrimonio González-Candelaria no estableció la irreparabilidad de su daño, más que el remedio solicitado de daño no constituye un daño irreparable. Aseveró que la parte apelante no estableció que tiene altas probabilidades de prevalecer en los méritos de su reclamación. Asimismo, OMG aseguró que el interés público no favorece la emisión del remedio ni la naturaleza del alegado daño de la parte apelante no favorece el remedio.

En oposición a la desestimación solicitada por OMG, el 21 de octubre de 2022, el matrimonio González-Candelaria estableció que durante las vistas evidenciaria se probó clara y patentemente que OMG usurpó ilegalmente el negocio que fundaron bajo Organic Med.[9] Manifestó que se desfiló prueba para establecer que el señor González Droz fue el fundador de Organic Med, que la administración de la corporación se afectó por el Huracán María, el suicidio del químico, los terremotos y la pandemia. Señaló que se demostró que OMG desconocía quiénes eran los accionistas de la corporación al momento de realizarse el *Written Consent*, ni demostró quiénes eran los accionistas mayoritarios. Apuntó que el señor González Droz testificó que no le vendió acciones a persona alguna, puesto que requería el aval de la Oficina de Cannabis Medicinal del Departamento de Salud, sino que vendió participaciones. Asimismo, alegó que durante las vistas evidenciarias se pudo apreciar que OMG obstruyó la entrada

---

[9] *Íd.*, Anejo 8, págs. 129-141.

del señor González Droz a las facilidades y se desconoce el paradero de los documentos importantes de la corporación. Por ello, le solicitó al TPI que le ordene a OMG entregar todos los contratos y documentos alegadamente incautados para que se presenten como evidencia. Por otro lado, indicó que ante la Junta Reglamentadora de Cannabis Medicinal se presentó un documento en el que se imitó la firma del señor González Droz, presuntamente confirmado por el perito Álvarez Ghigliotti. Por lo anterior, solicitó que se permitiera la continuación de los procedimientos.

Sometido el asunto, el 19 de octubre de 2023, el TPI emitió una Sentencia Parcial en la que declaró Ha Lugar la solicitud de desestimación de OMG al amparo de la Regla 39.2(c) de Procedimiento Civil, *supra*, R. 39.2(c), por lo que desestimó todas las causas de acción instadas por el matrimonio González-Candelaria.[10] El Foro Primario consignó que evaluadas las alegaciones de las partes, los escritos presentados y aquilatada la prueba testifical y documental presentada durante las vistas por la credibilidad que le mereció los testigos y a la luz del derecho aplicable, formuló las siguientes determinaciones de hechos:

> 1. En el año 2016, el Sr. Efraín González Droz conoció, por medios de comunicación escritos, que el entonces Gobernador Hon. Alejandro García Padilla había firmado una Orden Ejecutiva que viabilizaba el uso del cannabis medicinal en Puerto Rico.
>
> 2. El Sr. González se comunicó con el Sr. Juan Álvarez ("Sr. Álvarez") y le encomendó que se asesorara con el Departamento de Salud de Puerto Rico sobre los requisitos para establecer un negocio relacionado a productos que contuvieran cannabis.
>
> 3. El codemandante, señor González Droz, instruyó al señor Álvarez a que contratara los servicios legales del licenciado Goodwin Aldarondo ("Lcdo. Aldarondo") por su conocimiento sobre la industria del Cannabis.
>
> 4. El señor Álvarez y el señor Ronald Castillo ("Sr. Castillo") viajaron al estado de Colorado para orientarse

---

[10] *Íd.*, Anejo 1, págs. 1-45; Anejo 2, pág. 46. Archivada y notificada el 30 de octubre de 2023.

sobre la industria del cannabis medicinal. Ese viaje fue planificado por el Lcdo. Aldarondo.

5. El señor González sostuvo que los gastos iniciales del negocio llamado Organic Med Growers, Inc. ("Organic Med") fueron sufragados con fondos de la entidad llamada PDP Health Management ("PDP").

6. El señor Álvarez fue el socio incorporador de Organic Med.

7. El señor Álvarez llevó a cabo los trámites iniciales para desarrollar el negocio Organic Med. Entre éstos, participó en el proceso de elección del nombre de la corporación, la búsqueda de locales para ubicar el establecimiento y el cumplimiento de los requisitos exigidos por la reglamentación aplicable para establecer un negocio de cannabis.

8. El señor Álvarez completó los documentos necesarios y realizó los trámites para la incorporación de Organic Med ante el Departamento de Estado de Puerto Rico.

9. El señor Álvarez tiene un 26% de las acciones de Organic Med, desde su inicio en el año 2016.

10. El señor Castillo tiene 25% de las acciones de Organic Med, desde su inicio en el año 2016.

11. El porciento de acciones del señor Álvarez en Organic Med no dependía de que éste se mantuviera trabajando en el negocio.

12. El 26 de septiembre de 2016, el licenciado Aldarondo le envió al señor Álvarez un correo electrónico anejando un documento al que se refiere como "Acuerdo de Accionistas.docx."

13. Ese mismo día, el señor Álvarez le remitió este correo electrónico y el documento al señor González. El asunto de la comunicación indicaba "Fwd: ACUERDO ACCIONISTAS."

14 El correo electrónico del señor Álvarez al señor González lee "[a]djunto acuerdo de accionistas según se presentará en la propuesta para su firma".

15. El señor González testificó que, tras recibir el Acuerdo de Accionistas por correo electrónico el 26 de septiembre de 2016, no respondió a esa comunicación ni objetó su contenido.

16. El documento anejado al correo electrónico del día 26 de septiembre de 2016 se titula "Acuerdo de Miembros de Organic Med Growers" ("Acuerdo de Accionistas").

17. El Acuerdo de Accionistas detalla la distribución de las acciones de Organic Med entre los accionistas como sigue:
- Juan [Á]lvarez- 26%

- Ronald S. Castillo- 25%
- Efraín González- 12%
- Yessenia Candelaria- 12%
- Martín Avilés- 15%
- PDP- 10%

18. La distribución de acciones incluida en el Acuerdo de Accionistas se estableció por acuerdo de los accionistas iniciales.

19. El Dr. Avilés firmó el Acuerdo de Accionistas en el estado de Luisiana, lo envió por correo a Puerto Rico y fue recibido por el señor Álvarez.

20. El señor Álvarez también recibió el Acuerdo de Accionistas con las firmas del Sr. Efraín González y la señora Candelaria por correo en Puerto Rico.

21. Los últimos en firmar el Acuerdo de Accionistas fueron el señor Álvarez y el señor Castillo, quienes se lo entregaron al licenciado Aldarondo para que lo hiciera formar parte de los documentos que se presentarían ante el Departamento de Salud, como parte de la solicitud de licencias expedidas por esta agencia.

22. La fecha en el Acuerdo de Accionistas se colocó cuando el documento estaba en poder del licenciado Aldarondo.

23. En ese momento, los accionistas iniciales de Organic Med acordaron que la fecha que se colocaría en el Acuerdo de Accionistas sería la fecha en que se formó la entidad y no en la que se firmó para que se retrotrajera a la fecha de la incorporación.

24. El señor Castillo reconoció las firmas plasmadas en el Acuerdo de Accionistas y el mismo formó parte de los documentos sometidos al Departamento de Salud para las solicitudes de ciertas licencias expedidas por dicha agencia.

25. La parte codemandante, señor González, se mantuvo en su posición de que, ni él ni su esposa la Sra. Candelaria firmaron el referido Acuerdo de Accionistas.

26. El perito de la parte demandante, Evaristo Álvarez Ghigliotti, ("perito"), testificó que hizo una comparación y análisis de las firmas del Sr. González y de la Sra. Candelaria en el Acuerdo de Accionistas contra ciertas muestras de firmas conocidas de éstos y concluyó que, basado en su análisis, existe una alta probabilidad de que las firmas del Sr. González y la Sra. Candelaria, que aparecen en el Acuerdo de Accionistas, no fueran escritas por ellos en el documento original.

27. Sin embargo, el perito explicó que sus conclusiones se basan en unas muestras de firmas del Sr. González y la Sra. Candelaria, según contenidas en un formulario que, según surge del informe, el perito le entregó a la representación legal de los demandantes para que éste,

a su vez, se lo hiciera llegar al Sr. González y la Sra. Candelaria y que fuera completado por éstos.

28. El perito testificó que el formulario fue recibido por correo.

29. Las muestras de firmas contenidas en el formulario entregado al perito no fueron tomadas en presencia del perito.

30. Surge del informe pericial sometido por la parte demandante que la Sra. Candelaria proveyó catorce muestras de firma y esas firmas se compararon con un solo documento de firma conocida.

31. Por su parte, surge del informe pericial que el Sr. González proveyó veinticinco muestras de firma y esas firmas se compararon con seis documentos de firma conocida.

32. El perito no pudo explicar la diferencia entre la cantidad de muestras tomadas al Sr. González y las tomadas a la Sra. Candelaria.

33. El Sr. González admitió que, antes de presentar los casos consolidados que aquí se ventilan, no levantó o cuestionó su firma o la de su esposa la Sra. Candelaria en el Acuerdo de Accionistas.

34. Para el mes de septiembre de 2016, Organic Med se encontraba en el proceso de solicitar las licencias de cultivo y manufactura de cannabis medicinal, expedidas por el Departamento de Salud a establecimientos de cannabis medicinal.

35. El Acuerdo de Accionistas que contenía la distribución inicial de las acciones de Organic Med se sometió a la Oficina de Cannabis Medicinal del Departamento de Salud, junto a otra serie de documentos, como parte de la solicitud de las licencias para cultivo y manufactura de productos de cannabis medicinal.

36. El señor Álvarez presentó las solicitudes ante la Oficina de Cannabis Medicinal.

37. En ese momento, ni el señor González ni la señora Candelaria le comunicaron al Sr. Álvarez reparo alguno sobre los documentos que se presentarían ante el Departamento de Salud.

38. El señor González afirmó que conoce el procedimiento para solicitar las licencias expedidas por la Oficina [d]e Cannabis Medicinal del Departamento de Salud de Puerto Rico para la operación de establecimientos de cannabis.

39. Entre los requisitos para solicitar las referidas licencias, el señor González afirmó que conoce que hay que presentar una solicitud y desglosar los porcentajes de participación de cada accionista en el negocio.

40. La Oficina de Cannabis Medicinal aprobó las licencias para la manufactura y el cultivo de cannabis medicinal en el establecimiento localizado en la Carr. 123 Km 0.6, Calle Salmón, Lote #5, Barrio Playa, en Ponce, Puerto Rico, según solicitadas por Organic Med.

41. El señor González aseguró que recibió un correo electrónico el 7 de noviembre de 2016, con copia de la notificación de precalificación de parte del señor Álvarez.

42. Luego de que la precalificación fue emitida por la Oficina de Cannabis Medicinal del Departamento de Salud, el señor González vendió acciones adicionales de Organic Med a las siguientes personas: Federick Ray Pitre ("Sr. Pitre"), Jeffrey Swetnam ("Dr. Swetnam"), Roy Chu ("Dr. Chu"), George Stadler ("Sr. Stadler"), William Zeichner ("Dr. Zeichner") y F[é]lix Rosa ("Dr. Rosa").

43. De igual forma, el señor González indicó que recibió, aproximadamente 2.7 millones de dólares en aportaciones, por parte de amistades y/o colegas. Dichos fondos estaban destinados para Organic Med.

44. Específicamente, el señor González testificó que recibió $400,000 del Dr. Martín Avilés ("Dr. Avilés"), $500,000 del Dr. Swetnam, $900,000 del Sr. Pitre, entre otras partidas.

45. La inversión monetaria del señor Stadler en Organic Med, adicional a la del Dr. Avilés, Dr. Swetnam, Dr. Chu, Dr. Zeichner, Dr. Rosa, Sr. Pitre, fue de aproximadamente tres millones doscientos sesenta y cinco mil dólares ($3,265,000).

46. El señor Castillo no hizo aportación monetaria a Organic Med.

47. El señor González depositó los fondos en su cuenta personal en la institución bancaria Wells Fargo y él tenía el control absoluto de ese dinero.

48. El señor Stadler depositó $250,000.00, destinados a Organic Med en la cuenta de Wells Fargo a nombre del señor González.

49. Entre los récords de negocio de Organic Med no hay un libro de cuentas que detalle en qué se invirtieron esas sumas millonarias.

50. El codemandante, señor González, no presentó facturas, recibos u otra prueba documental fehaciente sobre las sumas que éste o su esposa la Sra. Candelaria invirtieron en el negocio.

51. Entre los récords de negocio de Organic Med, no hay un registro con los certificados de acciones emitidos a los accionistas originales.

52. El señor González no indicó o sostuvo de dónde provenían las acciones adicionales que vendió al Sr.

Pitre, el Dr. Swetnam, al Dr. Chu, al Dr. Zeichner, al Dr. Rosa y al Sr. Stadler, luego de obtener la precalificación de la Oficina de Cannabis Medicinal del Departamento de Salud.

53. Entre los récords de negocio de Organic Med, no hay un registro con las acciones que el señor González vendió, luego de obtener la precalificación de la Oficina de Cannabis Medicinal del Departamento de Salud.

54. Entre los récords de negocio de Organic Med, no hay un documento que indique que las acciones de los accionistas originales habían sido diluidas.

55. El 12 de diciembre de 2006, la Junta de Licenciamiento y Disciplina Médica de Puerto Rico suspendió la licencia del Sr. Efraín González Droz para practicar la medicina en Puerto Rico.

56. Como parte de un procedimiento ante la Junta de Licenciamiento y Disciplina Médica del estado de California, adscrita al Departamento de Asuntos del Consumidor de ese mismo estado, el Sr. Efraín González Droz se enfrentó a múltiples cargos por negligencia grave, no mantener registros médicos adecuados, ayuda o incitación a la práctica no autorizada de la medicina, actos de incompetencia profesional, deshonestos o corruptos y difusión de información falsa o engañosa, respecto a los servicios profesionales.

57. El codemandante, señor González, suscribió un *Stipulated Surrender of License and Order*, mediante el que entregó su licencia para practicar la medicina en el estado de California el 6 de enero de 2014.

58. En consecuencia, el señor González está impedido de practicar la medicina en el estado de California desde el año 2014.

59. La codemandante, señora Candelaria, también, enfrentó un procedimiento ante la Junta de Licenciamiento y Disciplina Médica del estado de California que resultó en que ésta entregara su licencia para practicar la medicina en ese estado el 11 de diciembre de 2018.

60. El señor González está registrado en el *OIG Exclusions List* de la Oficina del Inspector General, adscrita al Departamento de Salud y Servicios Humanos de los Estados Unidos, desde el año 2014.

61. Las personas incluidas en la referida lista de exclusión están impedidas de recibir fondos federales de los programas Medicare o Medicaid.

62. El perito Álvarez Ghigliotti admitió que, de haber conocido la reputación del Sr. González y la Sra. Candelaria previamente, no hubiese confiado en las respuestas de éstos incluyendo en el formulario en el que descansó su informe, donde las muestras de firmas no se tomaron en su presencia.

63. El Sr. José Román Flores ("Sr. Román") es director de operaciones de dos plantas de cannabis en Puerto Rico.

64. En o alrededor del año 2020, el señor Román sostuvo conversaciones con el señor González para potencialmente adquirir un 49% de las facilidades del negocio de Organic Med por la suma de 2.5 millones de dólares.

65. El abogado del señor Román, el Lcdo. Pedro Román, y el señor González prepararon un borrador que recogía estas propuestas.

66. Ese borrador incluye la siguiente distribución de las acciones de Organic Med:
- Ray Pietri [sic] – 9%
- Mart[í]n Avil[é]s – 20%
- Jeff Swetnam -15%
- Roy -1.5%
- George Stadler – 1.5%
- F[é]lix Rosa – 1%
- Unknoun [sic] –

67. En el referido borrador, no se hace referencia a la distribución de acciones de Organic Med del Sr. Álvarez, el Sr. Castillo, el Dr. Zeichner, el Sr. González, la Sra. Candelaria o PDP.

68. Las ofertas del Sr. Román nunca se perfeccionaron; el borrador preparado por el abogado del Sr. Román no fue firmado y los términos allí contenidos no fueron ejecutados.

69. El señor Stadler estableció que conoció del negocio de Organic Med por primera vez en el año 2018, a través del Dr. Swetnam.

70. El señor Stadler se dedicó a la industria culinaria y trabajó en distintos restaurantes y hoteles alrededor del mundo durante su carrera profesional.

71. Posteriormente, el señor Stadler se dedicó a la industria de casinos, donde ocupó puestos gerenciales de presidente y vicepresidente en la administración de distintos casinos en los Estados Unidos.

72. Como parte de su empleo en la industria de casinos, el señor Stadler estuvo encargado de supervisar a sobre mil personas.

73. Tras retirarse de la industria de casinos, el señor Stadler se ha dedicado a hacer trabajo de consultoría. Específicamente, ofrece sus servicios a negocios de casinos en Estados Unidos, la República Dominicana y a negocios pequeños y emergentes en el estado de la Florida.

74. El señor Stadler se involucró concretamente con Organic Med, en el mes de octubre del año 2019, tras sostener unas conversaciones sobre el negocio con el Sr. Efraín González y transferir $250,000 a la cuenta del señor González en Wells Fargo.

75. El señor Stadler estableció que solicitó al Sr. González los informes financieros mensuales de Organic Med, su certificado de acciones, el contrato de operación de Organic Med, entre otros documentos, relacionados al negocio, los cuales no recibió del Sr. González.

76. El señor Stadler viajó a Puerto Rico para noviembre de 2019, para visitar las facilidades de Organic Med y obtener la información solicitada al Sr. González.

77. El señor Stadler testificó que el señor González le indicó en reiteradas ocasiones que era el fundador y accionista mayoritario de Organic Med.

78. El señor Stadler fue recibido por el señor González y, al visitar el establecimiento, observó que el producto no estaba empacado, que había artículos de comida en el suelo, que las facilidades no estaban en condiciones sanitarias, que el aire acondicionado instalado en el establecimiento era para unidades residenciales y no industriales, entre otras deficiencias.

79. Durante su visita en el año 2019, el señor Stadler se dedicó a conocer el capital, funcionamiento y eficiencia del negocio e identificó una falta de organización en Organic Med.

80. El señor Stadler recopiló sus observaciones y notificó al señor González sus hallazgos.

81. Específicamente, el señor Stadler le entregó al señor González ciertos informes preparados por él y una comparación con diferencias marcadas entre las proyecciones del negocio a cinco años que le había informado el Sr. González y las que documentó el propio señor Stadler tras su visita.

82. El señor González no se reunió con el señor Stadler para discutir los hallazgos de su visita.

83. El señor Stadler regresó al estado de la Florida, luego de su visita en noviembre de 2019 y compartió sus observaciones con otros accionistas de Organic Med, particularmente con el Dr. Swetnam y el Dr. Chu.

84. En el año 2019, el señor González requirió dinero adicional, por encima de la compra de acciones a los siguientes accionistas de Organic Med a través de *cash calls*: al Sr. Stadler, Dr. Avilés, Dr. Swetnam y al Sr. Pitre.

85. El señor Stadler no le hizo pago adicional al señor González, como resultado de estos *cash calls*.

86. El Dr. Avilés, el Dr. Swetnam y el Sr. Pitre hicieron una inversión adicional de aproximadamente $765,000.00, como resultado de los *cash calls* del señor González.

87. En el año 2019, el señor González acordó verbalmente que le compraría al señor Castillo un 5% de sus acciones en Organic Med por $600,000.00.

88. El señor Castillo solo recibió un primer pago parcial de aproximadamente $66,000.00.

89. A solicitud de los doctores Avilés, Swetnam[,] Chu, Zeichner y Rosa y el señor Pitre, el señor Stadler hizo un segundo viaje a Puerto Rico, en febrero del año 2020, con el propósito de obtener información precisa sobre el inventario de la empresa y organizar las finanzas.

90. El señor Stadler conoció al señor Castillo en su segundo viaje a Puerto Rico, en febrero de 2020.

91. Previo al segundo viaje del señor Stadler, éste desconocía que existían accionistas en Organic Med, además de los doctores Avilés, Swetnam[,] Chu, Zeichner y Rosa y el señor Pitre.

92. Ante la ausencia de récords de negocio de Organic Med, que detallaran la distribución de las acciones en el negocio, el señor Stadler solicitó prueba directamente a cada uno de los accionistas que tenía conocimiento habían hecho transferencias de dinero destinadas a Organic Med, por vía del señor González.

93. El señor Stadler testificó que se le indicó que un accionista había vendido acciones, pero cuando solicitó la documentación relacionada a dicha venta, se le indicó que las acciones no se le habían pagado en su totalidad a este accionista.

94. Posterior a su visita en febrero de 2020, el señor Stadler conoció que el referido accionista era el señor Castillo.

95. El señor Stadler sostuvo que, al hacer su evaluación sobre las acciones que poseía, así como las que tenían los doctores Avilés, Swetnam[,] Chu, Zeichner y Rosa y los señores Pitre, Álvarez y Castillo, no era matemáticamente posible que el señor González y la señora Candelaria ostentaran la mayoría de las acciones en circulación.

96. El señor Stadler categóricamente expuso que no ha visto documento alguno que apoye que los codemandantes, señor González y la señora Candelaria, sean dueños de la mayoría de las acciones en circulación de Organic Med.

97. La parte demandante obró en detrimento de la Corporación y de los requisitos de Ley para el establecimiento y la operación de un negocio de cannabis medicinal en Puerto Rico.

98. La parte demandante no puede catalogarse accionista mayoritario.

99. La parte demandada obró conforme a la Ley y tomó las acciones correctas al elegir una nueva Junta de Directores.

100. La parte demandante no probó los requisitos de ley para que este Tribunal deba expedir discrecionalmente un interdicto estatutario o procesal a su favor.

101. La parte demandante ha obrado con temeridad.

El TPI consignó que para el matrimonio González-Candelaria rebatir la corrección de los actos tomados por OMG, correspondía demostrar que poseían la mayoría de las acciones emitidas. No obstante, el Foro Primario concluyó que no demostraron ser los únicos accionistas de Organic Med ni ostentar la mayoría de las acciones de la referida corporación. Estableció que, por el contrario, el único documento admitido en evidencia que desglosaba la distribución de las acciones emitidas por Organic Med demostró que la participación de la parte apelante en la corporación era de 24%, según un documento objetado por el señor González Droz por su firma. Sin embargo, el TPI expuso que las conclusiones periciales del perito Álvarez Ghigliotti, brindado por el matrimonio González-Candelaria para impugnar una firma, carecieron de confiabilidad y valor probatorio dado que, al testificar que las firmas comparadas no se tomaron delante de él, no existía certeza de que las muestras fueron realmente hechas por la parte apelante. El Foro Primario manifestó que no era razonable pensar que en el 2016, al señor González Droz no realizara nada al advenir en conocimiento de un documento con una firma alegadamente falsificada y que reflejaba que solamente ostentaba el 24% de las acciones. Según el Foro *a quo*, de la prueba surgió que de los propios actos del matrimonio González-Candelaria se demostró que conocían y aceptaron como verdadero el contenido del Acuerdo de Accionistas, el cual disponía que ostentaban el 24% de las acciones. El TPI concluyó que los señores

Álvarez, Castillo, Pitre, Avilés, Swetnam, Chu, Stadler, Rosa y Zeichner eran los accionistas mayoritarios de la corporación al momento de llevar a cabo el *Written Consent*. El Foro Primario dilucidó que dicho *Written Consent* fue válido dado que no existía disposición en la Ley General de Corporaciones, *supra*, que requiriera que la destitución de todos los directores y la elección para llenar las vacantes se realizara en actos separados. Además, que el matrimonio González-Candelaria no logró establecer que existió ilegalidad alguna en los procesos llevados a cabo por los accionistas de Organic Med. Asimismo, el TPI estableció que, dado que la parte apelante no demostró su condición como directores, no se le podía imputar deficiencias a las actuaciones de OMG. Por ello, el Foro Primario concluyó que no procedía el injunction estatutario bajo el Artículo 7.15 de la Ley General de Corporaciones, por lo que lo declaró No Ha Lugar. Además, el TPI resolvió que si el matrimonio González-Candelaria sufrió algún daño, fue consecuencia directa de sus propios actos y omisiones culposas y/o negligentes. Esto, puesto que de los testimonios emergieron las condiciones inadecuadas en las que se encontró el negocio, el hecho de que no existía constancia en los récords de negocios de Organic Med de cómo el señor González Droz utilizó las sumas millonarias que aportaron otros accionistas o de las acciones que vendió, y que dichas irregularidades provocaron que se decidiera remover a la parte apelante de cualquier posición en la corporación.

Insatisfecho con la determinación del TPI, el 14 de noviembre de 2023, la parte apelante presentó una *Moción al amparo de la Regla 43.1 y de reconsideración a la sentencia.*[11] Mediante esta, solicitó determinaciones de hechos y conclusiones de derecho adicionales y que el Foro Primario reconsiderara su decisión, a los fines de

---

[11] *Íd.*, Anejo 3, págs. 47-78.

determinar que no procedía la desestimación de la *Demanda*. El matrimonio González-Candelaria se sostuvo en que un consentimiento por escrito no unánime no era una forma válida de nombrar directores de una corporación. Sustentó que en los casos *Eduardo M. Joglar Castillo v. Advanced Wirelesss Communications*, KLAN201800645 y *Jorge M. Cañellas Fidalgo v. Party City of PR, Inc.*, KLAN201601177, resueltos por Paneles Hermanos de este Tribunal, se discutió la no validez de un consentimiento escrito no unánime.

Por su parte, el 4 de diciembre de 2023, OMG se opuso a la solicitud de determinaciones de hechos y conclusiones de derecho adicionales y a la reconsideración de la parte apelante y que, en su consecuencia, se confirmara el dictamen del 19 de octubre de 2023 en el que se ordenó la desestimación de todas las causas de acción en los casos consolidados.[12]

Expuesto los planteamientos de ambas partes, el 19 de enero de 2024, el TPI emitió una *Resolución sobre reconsideración, determinaciones de hechos y conclusiones de derecho adicionales*.[13] En esta, el Foro Primario declaró No Ha Lugar a la solicitud de reconsideración y resolvió que no puede acceder a que se realizaran determinaciones de hecho adicionales y eliminar otras, puesto que se apartaría de la prueba recibida, aquilatada y creída en la vista evidenciaria. Por ello, el TPI reiteró lo dictado mediante la Sentencia Parcial del 19 de octubre de 2023.

Inconforme con el dictamen del TPI, el 26 de febrero de 2024, el matrimonio González-Candelaria compareció ante nos y planteó que el Foro Primario incidió en los siguientes señalamientos de error:

> **PRIMER ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR LA DEMANDA BAJO LA REGLA 39.2 (C) DE PROCEDIMIENTO CIVIL AL DETERMINAR QUE LOS DEMANDADOS CUMPLIERON CON LOS REQUISITOS DE LA LEY GENERAL DE CORPORACIONES DE

---

[12] *Íd.*, Anejo 4, págs. 79-106.
[13] *Íd.*, Anejo 5, págs. 107-110. Archivada y notificada el 24 de enero de 2024.

PUERTO RICO (14 L.P.R.A. § 3501 ET SEQ.) PARA DECLARAR VACANTE UNA JUNTA DE DIRECTORES CON INCUMBENTES Y NOMBRAR UNA NUEVA JUNTA DE DIRECTORES UTILIZANDO EL CONSENTIMIENTO POR ESCRITO (WRITTEN CONSENT), APARTÁNDOSE DE LOS PRECEDENTES DE ESTE HONORABLE TRIBUNAL DE APELACIONES EN LOS CASOS EDUARDO M. JOGLAR CASTILLO V. ADVANCED WIRELESS[...] COMMUNICATIONS, INC., KLAN201800645 (28 DE FEBRERO DE 2020); JORGE M. CAÑELLAS FIDALGO V. PARTY CITY OF PR, INC., KLAN201601177 (23 DE MARZO DE 2017) CASOS QUE NO FUERON APELADOS AL TRIBUNAL SUPREMO, POR LO QUE SON LOS ÚNICOS EN DETERMINAR SOBRE ESTA MATERIA EN PUERTO RICO.

**SEGUNDO ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL RECONOCER A VARIOS FIRMANTES DEL CONSENTIMIENTO ESCRITO COMO ACCIONISTAS DE ORGANIC MED GROWERS, INC. CUANDO NO SE PRESENTÓ EL LIBRO DE ACCIONISTAS O PRUEBA DOCUMENTAL EXTRÍNSECA QUE LES ACREDITE COMO TAL. TAMPOCO PRESENTARON EVIDENCIA QUE LA TRANSFERENCIA DE ACCIONES CONTARA CON LA APROBACIÓN DEL DEPARTAMENTO DE SALUD COMO REQUIERE LA LEY Y REGLAMENTO PARA REGULAR LA INDUSTRIA DE CANNABIS EN PUERTO RICO.

**TERCER ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA PARTE DEMANDANTE FUE TEMERARIA Y FRÍVOLA POR LLEVAR SU CAUSA DE ACCIÓN CORPORATIVA EN DEFENSA DE SU NEGOCIO Y POR ELLO CONCEDER HONORARIOS DE ABOGADOS A LA PARTE DEMANDADA.

El 29 de febrero de 2024, emitimos una *Resolución* en la que le otorgamos a la parte apelante hasta el 4 de marzo de 2024 para que informara si se proponía reproducir la prueba oral y acreditara el método que utilizaría.

Transcurrido el término concedido sin recibir respuesta por parte del matrimonio González-Candelaria, el 5 de marzo de 2024, emitimos una *Resolución* en la que hicimos constar que continuarían los procedimientos, por lo que le otorgamos a la parte apelada hasta el 25 de marzo de 2024 para presentar su alegato.

Pasado el término concedido, el 7 de marzo de 2024, el matrimonio González-Candelaria nos planteó que, dado que la transcripción de la prueba era onerosa, solicitaba someter una

transcripción oral parcial de aquellos testimonios relacionados a los errores señalados en su recurso de apelación.

En cumplimiento con nuestra orden, el 25 de marzo de 2024, OMG presentó su alegato.

Ante la oposición de OMG, el 1 de abril de 2024 emitimos una *Resolución* en la que declaramos No Ha Lugar a la solicitud de presentar una transcripción oral parcial, por lo que le otorgamos a la parte apelante un término de treinta (30) días para presentar la totalidad de la transcripción oral de la prueba.

El 1 de mayo de 2024, el matrimonio González-Candelaria presentó una moción informativa a los fines de comunicar que, debido a su condición económica limitada, se prosiguiera con los procedimientos ante esta Curia Apelativa sin la transcripción de la prueba oral y se evaluara solamente la controversia en derecho sobre el proceso llevado en el *Written Consent* del 30 de abril de 2020. Además, nos solicitó incluir anejos no incluidos en el apéndice del recurso de apelación y elevar los autos.

El 6 de mayo de 2024, emitimos una *Resolución* en la que establecimos que, luego de considerar el tracto procesal del caso, autorizamos la inclusión de los anejos sin que sea necesario elevar los autos.

En igual fecha, OMG presentó una *Solicitud de desestimación por incumplimiento craso con el Reglamento del Tribunal de Apelaciones*. Esto, en vista de que concibió que el apéndice del recurso de apelación y la moción informativa de la parte apelante era impropia y constituía una conducta sancionable al retrasar e impedir la adecuada gestión revisora de este Foro Apelativo.

En atención a lo anterior, el 8 de mayo de 2024, emitimos una *Resolución* declarando No Ha Lugar a la solicitud de desestimación de OMG.

Posteriormente, el 20 de junio de 2024, el matrimonio González-Candelaria presentó una moción a los fines de que celebremos una vista oral para aclarar los argumentos de su alegato y le otorguemos una prórroga para replicar lo alegado por la parte apelada. Sobre tal petición nos pronunciamos No Ha Lugar, ante lo resuelto en este recurso.

Con el beneficio de la comparecencia de ambas partes, procedemos a exponer la normativa jurídica atinente a este recurso.

## II.

### A. Apreciación de la prueba

En nuestro ordenamiento jurídico, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el Foro Primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, puesto que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009). Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, *supra*, R. 42.2 dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida

consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos".

De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336 (2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779. De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez*, 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra*.

Los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 918 (2016); *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

**B. Desestimación por insuficiencia de la prueba (*non-suit*)**

La Regla 39.2 (c) de Procedimiento Civil, *supra*, R. 39.2(c), rige lo concerniente a la desestimación de un pleito por insuficiencia de la prueba. A saber, la referida regla dispone lo siguiente:

> **(c) Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno.** El tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal lo disponga de otro modo en su orden de desestimación, una desestimación bajo esta Regla 39.2 y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos. Regla 39.2 (c) de Procedimiento Civil, *supra*, R. 39.2(c) (Énfasis nuestro).

Al resolver esta moción, el Tribunal de Primera Instancia debe determinar los hechos probados hasta ese momento y si resulta que no existe prueba sobre algún aspecto esencial y necesario de las alegaciones para conceder algún remedio a la parte demandante, debe declarar con lugar la solicitud de desestimación. R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho procesal civil*, 6ta. ed., San Juan, Ed. Lexisnexis de Puerto Rico, 2017, pág. 412. Es necesario que el Foro Primario esté plenamente convencido de que no existe duda en que la parte demandante no tiene derecho a la concesión de remedio alguno. *Lebrón v. Díaz*, 166 DPR 89, 94 (2005). De lo contrario, si la prueba desfilada ante el tribunal de instancia tiende a demostrar que bajo alguna circunstancia la parte

demandante puede prevalecer, se requiere que la parte demandada presente su caso para que el tribunal posea una visión más completa de los hechos. *Íd.*; *Colombani v. Gob. Municipal de Bayamón,* 100 DPR 120, 122-123 (1971).

### C. Consentimiento de los accionistas en lugar de la celebración de una reunión

El Artículo 7.17 de la Ley General de Corporaciones, *supra*, sec. 3657, dispone lo que sigue:

> A. Salvo que el certificado de incorporación disponga otra cosa, se podrá realizar, sin que se celebre una reunión, sin convocatoria y sin votación, cualquier acto que este Artículo requiera que se lleve a cabo en cualquier reunión anual o extraordinaria de accionistas de una corporación, o cualquier acto que se permita realizar en cualquier reunión anual o extraordinaria de tales accionistas, si los accionistas tenedores de las acciones en circulación que tengan el mínimo necesario de votos para autorizar o realizar el acto en una reunión en que estuvieran presentes todos los accionistas con derecho al voto y ejercieran tal derecho, consienten por escrito a la acción tomada y dichos consentimientos son entregados en la oficina designada de la corporación, su lugar principal de negocios o a un oficial o agente de la corporación que tenga la custodia de los libros en que las minutas de las reuniones de accionistas son archivadas. Cualquier entrega a la oficina designada de la corporación será a la mano o por correo certificado o registrado con acuse de recibo.
> B. Salvo que se disponga otra cosa en el certificado de incorporación, se podrá realizar, sin que se celebre una reunión, sin convocatoria y sin votación, cualquier acto que requiera este Artículo que se realice en cualquier reunión anual o extraordinaria de miembros de una corporación sin acciones, o cualquier acto que se permita realizar en cualquier reunión anual o extraordinaria de tales miembros de una corporación sin acciones, si los miembros que tengan el mínimo necesario de votos para autorizar o realizar tal acto en una reunión en que estuvieran presentes todos los miembros con derecho al voto y ejercieran tal derecho, suscribieren un documento en que se consigne por escrito su consentimiento a la acción tomada. Dicho consentimiento deberá de ser entregado a la corporación en la forma descrita en el inciso (A) de este Artículo.
> [...]
> F. En caso de una acción que se hubiere tomado sin mediar una reunión y sin consentimiento unánime por escrito, se notificará dicha acción, sin dilación a los accionistas o miembros que no hubieren dado su consentimiento, los cuales, de haberse tomado la acción en una reunión, tendrían derecho a ser notificados de tal reunión si la fecha pautada para la reunión fuera la fecha en que los consentimientos para tomar acción suscritos por un número suficiente de accionistas o

miembros, hubiesen sido entregados a la corporación, según se dispone en el inciso (C) de este Artículo. En caso de que la acción a la cual se consintiere fuere una que hubiere requerido la radicación de un certificado con arreglo a cualquier otro Artículo de esta Ley, si se hubiere votado sobre tal acción, en una reunión de accionistas o de miembros, el certificado radicado con arreglo a tal Artículo consignará, en lugar de cualquier declaración requerida por tal Artículo respecto del voto de los accionistas o miembros, que el consentimiento por escrito se ha dado con arreglo a este Artículo y que la notificación por escrito se ha dado con arreglo a este Artículo.

A saber, el aludido artículo provee un método alterno para que los accionistas de una corporación ejerzan su derecho de participar y tomar decisiones sin necesidad de convocar y celebrar una reunión. M. Muñoz Rivera, *Ley de Corporaciones de Puerto Rico: análisis y comentarios*, San Juan, Ed. Ediciones STIUM, 2015, pág. 197. Importante es que **"[e]ste método alterno estará disponible, salvo que el Certificado de Incorporación disponga otra cosa, para cualquier acto que se permita realizar en cualquier reunión anual o extraordinaria de accionistas, incluyendo aquellas bajo el Artículo 7.01 [de la Ley General de Corporaciones, *supra*, sec. 3641]"**. *Íd.* (Énfasis nuestro). Sin embargo, el profesor Carlos Díaz Olivo destacó lo siguiente:

> **Cabe destacar que para que [...] el asunto pueda ser aproba[do] mediante el consentimiento escrito, es necesario que todos los accionistas sean consultados y su consentimiento auscultado. Si bien el Artículo 7.17 excusa la necesidad de enviar una convocatoria o citación cuando se utiliza este procedimiento, esto no implica ni puede entenderse como una autorización para actuar a escondidas de alguno de los accionistas, con el fin de ocultarle que se está contemplando tomar una acción que puede afectar sus intereses mediante el consentimiento escrito. Una cosa es que no sea necesario tener que convocar a una reunión de accionistas, porque precisamente el objetivo es no tener que celebrar una reunión física de accionista, y otra cosa muy distinta es que se puedan tomar decisiones por un sector de los accionistas en secreto y total exclusión de los restantes accionistas de la corporación. Todos los accionistas, salvo disposición en contrario en el certificado de incorporación, poseen los mismos derechos y por consiguiente, todos tienen que ser advertidos de que se contempla tomar cierta determinación mediante el mecanismo del**

> **consentimiento escrito, de modo que puedan participar y si así lo interesan, comunicarse con otros accionistas, antes de que se tome la determinación final.** C. E. Díaz Olivo, _Corporaciones: Tratado de Derecho Corporativo_, 2da. ed., Colombia, AlmaForte, 2018, pág. 272. (Énfasis nuestro).

La profesora Manuelita Muñoz Rivera expuso que se ha cuestionado este mecanismo alterno para preterir celebrar una reunión anual con el propósito de elegir a los directores, ya que el voto de los accionistas y la celebración de una reunión anual para la elección de directores se han considerado como derechos fundamentales. M. Muñoz Rivera, _op. cit._, pág. 197. En _Hoschett v. TSI International Software, Ltd._, 683 A. 2d 43 (Del.1996), el Tribunal de Cancillería de Delaware "reconoció este derecho fundamental al voto, que la celebración de la reunión anual es un requisito mandatorio y que en la misma se informe a los accionistas de, y ellos atenderán, otros asuntos además de la elección de directores; se requiere pues un elemento de deliberación". _Íd._, pág. 198. No obstante, el estado de Delaware enmendó su Ley de Corporaciones para autorizar que por consentimiento por escrito no unánime en sustitución a la reunión anual, se designe directores solamente cuando todas las posiciones estén vacantes. _Íd._, pág. 199.

De forma similar, el Artículo 7.01 (C) de la Ley General de Corporaciones de Puerto Rico, _supra_, 3641, permite que cuando todas las posiciones directivas estén vacantes, se llenen dichas vacantes de directores por virtud del consentimiento no unánime de los accionistas. La referida regla dispone lo que sigue:

> C. Salvo que los directores sean elegidos por consentimiento de los accionistas en lugar de reunión, según provee este inciso, se celebrará una reunión anual de accionistas para elegir los directores en la fecha y hora designadas por los estatutos corporativos o en la manera dispuesta en los mismos. **Los accionistas podrán, excepto por disposición en contrario en el certificado de incorporación, elegir a los directores por consentimiento unánime de los accionistas en lugar de una reunión anual, sujeto a que si el consentimiento de los accionistas no es unánime, sólo se podrán elegir directores por el mecanismo de**

**consentimiento de accionistas en lugar de la celebración de una reunión si todas las posiciones directivas a las cuales se pudiera elegir a un director en la reunión anual de accionistas estuvieran vacantes al momento de la votación y son llenadas por el consentimiento de los accionistas.** Una elección de los directores por consentimiento de los accionistas en lugar de una reunión que se aparte de lo dispuesto en este inciso (B), no será suficiente para satisfacer el requisito de celebrar una reunión de accionistas anualmente. Cualquier otro asunto pertinente se podrá tratar en la reunión anual. Artículo 7.01 (C) de la Ley General de Corporaciones, *supra,* 3641. (Énfasis nuestro).

La acción tomada mediante consentimiento no unánime será notificada sin dilación a los accionistas que no consintieron y que, de haberse tomado la acción mediante una reunión, hubiesen tenido derecho a ser notificados. M. Muñoz Rivera, *op. cit.*

### D. <u>Temeridad</u>

La Regla 44.1 (d) de Procedimiento Civil, *supra,* R. 44.1 (d), dispone que si una parte o su representante legal procedió con temeridad o frivolidad, el tribunal deberá imponer el pago de una suma por concepto de honorarios de abogado por tal conducta. A diferencia de los intereses legales presentes expuestos en la Regla 44.3 de Procedimiento Civil, *supra,* R. 44.3, los cuales están disponibles solo para acciones de cobro de dinero y daño y perjuicios, los honorarios de abogados aplican como sanción en cualquier tipo de acción judicial. El Tribunal Supremo ha definido que:

**[E]l amplio concepto de temeridad conlleva aquellas actuaciones de un litigante que lleven a un pleito que pudo evitarse, que provoquen la prolongación indebida del trámite judicial o que obliguen a la otra parte a incurrir en gastos innecesarios para hacer valer sus derechos.** Un litigante perdidoso actúa con temeridad cuando por su terquedad, testarudez, obstinación, contumacia, empecinamiento, impertinencia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte a asumir innecesariamente las molestias, gastos e inconvenientes de un pleito. *SLG González-Figueroa v. SLG et al.*, 209 DPR 138, 148-149 (2022) (Énfasis nuestro).

Por otro lado, "es claramente temeraria la parte que insiste contumazmente en alegar algo sin alguna prueba fehaciente que lo

apoye, que niega los hechos que le constan o son de fácil corroboración y dilata los procedimientos judiciales para no responder por su obligación". *Íd.*, pág. 149. Ahora bien, no es un litigante temeroso quien plantea asuntos complejos y novedosos sobre los cuales no existen precedentes vinculantes o cuando exista alguna desavenencia honesta sobre el derecho aplicable a los hechos del caso. *Íd.* Pues, es norma reiterada que "no puede penalizarse a un litigante que utiliza las vías judiciales para vindicar un derecho por el simple hecho de no haber prevalecido en su acción". *Santos Bermúdez v. Texaco PR, Inc.*, 123 DPR 351, 355 (1989).

Con esta sanción, el Tribunal tiene un mecanismo poderoso para garantizar la eficiencia en la administración de la justicia y el buen funcionamiento de los tribunales para lograr la solución justa, rápida y económica de todo procedimiento judicial. *SLG González-Figueroa v. SLG et al.*, *supra.* No obstante, la imposición de esta sanción descansa en la sana discreción judicial que solamente será variada en apelación cuando se demuestre abuso de discreción. *Íd.*, pág. 150; *VS PR, LLC v. Drift-Wind*, 207 DPR 253, 277 (2021); *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 211 (2013).

A la luz de la normativa jurídica antes pormenorizada, procedemos a aplicarla a los hechos de este caso.

**III.**

En el presente caso, el matrimonio González-Candelaria nos señaló que el TPI incidió en cometer tres (3) errores. En esencia, la parte apelante esbozó que el TPI no comprendió su argumento sobre que el Artículo 7.01(c) de la Ley General de Corporaciones, *supra*, sec. 3641, establece que la elección de los directores por consentimiento escrito tiene que contar con la unanimidad de todos los accionistas y que sólo en la eventualidad de que todas las posiciones de la junta de directores estén vacantes se podía utilizar el consentimiento escrito no unánime. Sostuvo que el consentimiento escrito objeto de este

pleito no contó con unanimidad, dado que la parte apelante no prestó su consentimiento, siendo accionistas de la corporación. Planteó que el TPI aceptó como bueno la interpretación de OMG en que por mayoría de accionistas se podía remover a los directores para dejar vacante la junta de directores y llenar las posiciones sin el requisito de unanimidad del Artículo 7.01(c) de la Ley General de Corporaciones, *supra*, sec. 3641. Persuasivamente, subrayó que dicha determinación es contraria a lo que un Panel Hermano de esta Curia Apelativa resolvió en *Eduardo M. Joglar Castillo v. Advanced Wirelesss Communications, supra*, en el que puntualizó lo siguiente decidido en el citado caso:

> En el caso que nos ocupa, el apelante plantea, en síntesis, que el foro apelado incidió al desestimar su causa de acción al amparo del Art. 7.15 de la Ley de Corporaciones, *supra*, al aplicar las defensas de incuria y prescripción. **Al respecto, el apelante asevera que los señores Torres y Penna lo separaron ilegalmente de los puestos que ocupaba en la junta de directores de la AWC, en el momento en que por medio de un consentimiento escrito no unánime, constituyeron artificialmente una vacante en dicha junta, para eventualmente elegir una nueva junta de directores sin tener que celebrar la reunión anual de accionistas.** Todo ello en contra del proceso interdictal que provee el Art. 7.15 Ley de Corporaciones, *supra*. Por tratarse de errores que se relacionan entre sí, los mismos serán discutidos conjuntamente.
>
> Conforme surge del tracto fáctico del presente caso, los señores Torres Nogueras y Penna separaron ilegalmente al apelante de su cargo de director y oficial corporativo de AWC. Según vimos, éstos se valieron del consentimiento unánime escrito para separar al apelante; luego, **"destituir" a todos los miembros de la junta de directores de AWC a los fines de que todos los cargos estuvieran vacantes y así evadir la celebración de la reunión anual de accionistas; e inmediatamente, autonombrarse como presidente y secretario de la junta de directores de AWC. Ciertamente, el proceder de los señores Torres Nogueras y Penna se hizo en violación de los postulados aplicables de la Ley General de Corporaciones, *supra*.**

Por otro lado, el matrimonio González-Candelaria expuso que incidió el TPI al reconocer a varios firmantes del *Written Consent* como accionistas de Organic Med cuando al Foro Primario no se presentó

el libro de accionistas, conforme requiere el Artículo 7.09(C) de la Ley General de Corporaciones, *supra*, sec. 3649, ni se evidenció que la transferencia de acciones constara con la aprobación del Departamento de Salud. A su vez, esgrimió que el TPI le otorgó mayor peso a una prueba no pertinente de casos de negligencia médica del señor González Droz, los cuales fueron transados.

Por último, la parte apelante arguyó que el TPI abusó de su discreción al formular como determinación de hechos que el matrimonio González-Candelaria obró con temeridad. Esto, en vista de que su reclamo estaba basado en el caso *Eduardo M. Joglar Castillo v. Advanced Wirelesss Communications, supra,* resuelto por un Panel Hermano de esta Curia Apelativa. Por todo lo anterior, el matrimonio González-Candelaria nos peticionó revocar la *Sentencia Parcial.*

Por su parte, OMG estableció que lo resuelto por esta Curia Apelativa en *Eduardo M. Joglar Castillo v. Advanced Wirelesss Communications, supra,* y *Jorge M. Cañellas Fidalgo v. Party City of PR, Inc., supra,* si bien era persuasivo, no pautó una norma o principio jurídico de aplicación general. OMG distinguió que, contrario a lo resuelto en los citados casos, en el que nos concierne, el matrimonio González-Candelaria tuvo la oportunidad de presentar su caso mediante las vistas evidenciarias que se celebraron ante el TPI, más que la parte apelante no demostró elemento alguno para el remedio interdictal por incumplimiento con la Ley General de Corporaciones, *supra.* Por otra parte, OMG adujo que los accionistas mayoritarios actuaron de conformidad con el Capítulo 7 de la Ley General de Corporaciones, *supra,* al consentir por escrito dejar todas las posiciones de la junta de directores vacante y, una vez vacantes todas las posiciones, eligieron a los directores mediante el mecanismo de consentimiento de accionista en lugar de la celebración de una reunión, convocatoria o votación. Esto, toda vez que a juicio de OMG, la Ley General de Corporaciones, *supra,* expresamente, provee para

que se realice cualquier acto mediante consentimiento escrito y que la Asamblea Legislativa no realizó distinción alguna al disponer la frase "cualquier acto". A su vez, planteó que, aunque como norma general, los directores se eligen mediante una reunión, existen dos (2) excepciones para preterir la celebración de una reunión. A saber, mediante el consentimiento unánime de los accionistas y el consentimiento de accionistas cuando todas las posiciones directivas estuvieran vacantes. Con respecto a los planteamientos de error relacionados a la apreciación de la prueba, OMG manifestó que la parte apelante renunció a los mismos. Asimismo, OMG alegó que esta Curia Apelativa no debe intervenir con la determinación discrecional del TPI en cuanto a la temeridad del matrimonio González-Candelaria, excepto que exista abuso de discreción por parte del Foro Primario. Sobre el particular, reveló que la parte apelante no actuó con diligencia y buena fe en la tramitación del pleito, entorpeciendo la continuidad del negocio y obligarlos a incurrir en cuantiosas cuantías en honorarios para defenderse.

Tras evaluar en su totalidad las alegaciones de ambas partes, procedemos a resolverlas. Como cuestión de umbral, nos resulta importante particularizar que todos los señalamientos de error del matrimonio González-Candelaria versan sobre cuestiones relacionadas con la apreciación de la prueba. Esto, ya que la parte apelante esgrimió, en primer lugar, que incidió el TPI al determinar que OMG cumplió con los requisitos de la Ley General de Corporaciones, *supra*, al declarar vacante la junta de directores para nombrar una nueva mediante el consentimiento por escrito. En segundo lugar, nos indicó que erró el TPI al reconocer a varios firmantes del *Written Consent* como accionistas de Organic Med cuando durante las vistas evidenciarias no se presentó el libro de accionistas, la prueba documental extrínseca que les acredite como accionistas, o la aprobación del Departamento de Salud sobre la

transferencia de las acciones. Por último, sostuvo que incidió el Foro Primario al formular como determinación de hecho que la parte apelante actuó temerariamente.

Luego de examinar minuciosamente dichos señalamientos de error, nos resulta forzoso concluir que esta Curia Apelativa está impedida de atenderlos en sus méritos. Por virtud de sus señalamientos de errores, la parte apelante nos peticionó revisar las determinaciones de hechos formuladas por el Foro Primario, las cuales fueron alcanzadas tras aquilatar la prueba testifical y documental vertida durante los ocho (8) días en los que se celebraron las vistas evidenciarias. Fue el juzgador de hechos quien tuvo la oportunidad de observar la manera en que los testigos declararon, apreciar sus gestos, titubeos, contradicciones, entre otros factores que formalizaron su convicción en cuanto a la verdad y le permitieron formular las determinaciones de hechos que el matrimonio González-Candelario nos peticionó revisar. Véase *Suárez Cáceres v. Com. Estatal Elecciones, supra.* No obstante, es menester recordar que mediante una moción informativa del 1 de mayo de 2024, la parte apelante renunció a que apreciemos la prueba testifical vertida en el TPI, por no contar con la transcripción de la prueba oral. Es decir, el matrimonio González-Candelaria no nos colocó en posición para considerar los errores planteados ante este Tribunal, tras no proveer la transcripción de la prueba desfilada ante el Foro Primario. Recordamos que esta Curia Apelativa solo posee récords mudos e inexpresivos, por lo que tenemos el deber de respetar la labor del tribunal de instancia en su apreciación de la prueba, adjudicación de credibilidad y determinaciones de hechos, excepto se demuestre que haya obrado con error manifiesto, prejuicio, parcialidad o pasión.

No podemos evaluar si el TPI actuó mediante error manifiesto, prejuicio, parcialidad, pasión o abuso de discreción, tal como arguye la parte apelante, dado que precisamente carecemos del medio

esencial para realizar nuestra función revisora, que es la transcripción de la prueba oral. Por otro lado, la prueba documental presentada ante nos no fue suficiente para restar méritos a las determinaciones de hechos formuladas por el Foro Primario, sin el beneficio de la transcripción de la prueba oral. Esto, ya que de la propia *Sentencia Parcial* se puede apreciar que las determinaciones de hechos fueron formuladas a la luz de la prueba testifical. Por todo lo anterior, no podemos considerar los errores planteados por el matrimonio González-Candelaria ni distar de las determinaciones de hechos formuladas por dicho Foro, por carecer de la transcripción de la prueba.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia Parcial* emitida por el TPI.

De otra parte, se declara No Ha Lugar a la solicitud del matrimonio González-Candelaria en celebrar una vista oral ante este Foro Apelativo.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones